**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
ACTIVE LIFE HEALTH OF NY, P.C.,

|  |  |
|---|---|
| Plaintiff, | **MEMORANDUM OF DECISION & ORDER** |
| -against- | |
| SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | 23-CV-7834 (GRB) |
| Defendant. | |

-----------------------------------------------------------X

**GARY R. BROWN, United States District Judge**:

Before this Court is an appeal brought pursuant to 42 U.S.C. §405(g) of a decision by an Administrative Law Judge Eric Chinn ("ALJ") rendered on March 23, 2023, upholding an agency determination that plaintiff received Medicare overpayments exceeding $1.7 million. Both parties have moved under Fed. R. Civ. P. 12(c) for judgment on the pleadings.

*The Ruling*

Principally, this matter involves the provision of hyaluronan injections for Medicare patients suffering from osteoarthritis of the knee by plaintiff, Active Life Health of NY, P.C. ("ALH"). The issue was not the provision of the injections; rather, an overpayment was determined based upon plaintiff's provision of guided needle placement—a process utilizing fluoroscopy and/or contrast to assist the doctor in properly placing the injection. An audit, and later the ALJ, determined that the routine use of fluoroscopy and contrast injections by ALH was excessive and that ALH had failed to make the required individualized determinations of necessity of such treatment.

1

To be covered under Medicare, a service must be deemed reasonable and necessary in accordance with criteria set forth in various places, including the Medicare Program Integrity Manual ("MPIM"). As relevant here, a particular service must be "[o]ne that meets, but does not exceed, the beneficiary's medical need." MPIM, pub. 100-08, Chapter 3, § 3.6.2.2.

At the hearing, the ALJ heard medical testimony from Dr. Rush, the owner of ALH, and Dr. Whalen, a doctor who owned several similar practices and was retained by plaintiff for these purposes. DE 16 at 77. The ALJ, who generally credited the testimony of these two witnesses, explained that "[e]ssentially, Drs. Rush and Whalen testified that fluoroscopy is always necessary." *Id.* at 84. As a result, "the testimony supports that the appellant's physicians always use fluoroscopy regardless of the beneficiaries' condition, history or presentation." *Id.* He noted that "many of the claims at issue" provided solely a "generic statement not specific to each beneficiary." *Id.* At the same time, the ALJ found that "records reviewed by Dr. Whalen do not support that a determination was made that the beneficiaries' knees were such that blind needle insertion (without fluoroscopy) would not have met their needs." *Id.*

The ALJ further found that Dr. Whalen had "conceded that fluoroscopy can be performed without contrast to inject the hyaluronan." *Id.* at 85. The testimony reveals that Dr. Whalen specifically examined one instance in which administering injections using fluoroscopy without contrast (a separate billing item) proved "sufficient." DE 24, Appx 684. Ultimately, both Drs. Rush and Whalen conceded that the procedure can be performed without the contrast injections. DE 24, Appx. 660-61 (Rush: "It can be used without contrast"); Appx 682 (Whelan confirms that fluoroscopy can be used without contrast.). In his direct testimony, Dr. Rush admitted that other physicians regularly provide the injections without fluoroscopy, and described the practice of using fluoroscopy routinely in terms more befitting a business model than a necessary medical procedure:

2

> our patients come back to see us far more often than the medical literature says they come back to see orthopedic surgeons or family practice physicians or other physicians that do this procedure blind. They just put the needle in and hope that they're in the interarticular space.

DE 17-10 at 525. Notwithstanding Dr. Rush's uncharitable characterization of physicians who perform these services without fluoroscopy, Dr. Whalen testified that doctors are trained to perform such injections without the aid of visualizing equipment:

> [in] a setting where were the knee to be injected blindly, just like any part of the body, we would generally, as is our training, as we're trained to do, expect to encounter certain anatomy by feel, by general, sort of orientation of where we are injecting at that site . . .

*Id.* at 547; *cf.* DE 24, Appx 648 (Dr. Rush testifying about administering injections "when I feel like I'm in the interarticular space"); Appx 728 (same).

Taken together, these findings led the ALJ to conclude that plaintiff failed to demonstrate that the use of fluoroscopy and/or contrast in every instance was consistent with each patient's demonstrated needs. Thus, he upheld the determination that ALH had been overpaid in connection with the routine provision of fluoroscopy and contrast.

*Threshold Jurisdictional Issue*

The Government raises a procedural issue that, it argues, eliminates the Court's jurisdiction over this matter. According to 42 C.F.R. § 405.1132(b), a party may initiate an action in district court after it "receives the [Appeals Council's] notice that the Council is not able to issue a final decision, dismissal order or remand order." That same section provides that an action must be brought "within 60 calendar days after the date it receives the Council's notice." *Id.* Here, the action was filed on October 10, 2023, while the Appeals Council did not issue a notice that it was unable to issue a final decision until November 27, 2023, a month later. In other words, at this writing, the Appeals Council has issued a notice indicating that it would

3

not decide the matter, but such notice did not exist at the time the complaint was filed. Thus, the Government argues, preemptive filing of the action renders it subject to dismissal.

In *Weinberger v. Salfi*, 422 U.S. 749, 763–64 (1975), the Supreme Court held:

> Section 405(g) specifies the following requirements for judicial review: (1) a final decision of the Secretary made after a hearing; (2) commencement of a civil action within 60 days after the mailing of notice of such decision (or within such further time as the Secretary may allow); and (3) filing of the action in an appropriate district court, in general that of the plaintiff's residence or principal place of business. The second and third of these requirements specify, respectively, a statute of limitations and appropriate venue. As such, they are waivable by the parties[.] We interpret the first requirement, however, to be central to the requisite grant of subject-matter jurisdiction—the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'

Other decisions are in accord. *Iwachiw v. Massanari*, 125 F. App'x 330, 331 (2d Cir. 2005) ("The Commissioner's decision does not become 'final' until 'after the Appeals Council has denied review or decided the case after review.'"); *Doe v. Martucci*, No. 20-CV-02331 (PMH), 2024 WL 5118505, at *5 (S.D.N.Y. Dec. 16, 2024) ("It is well-settled 'that a final decision is a *prerequisite* for subject matter jurisdiction in the District Court.'").

Plaintiff relies on cases suggesting that where the exhaustion of administrative remedies is futile, the requirement may be waived. DE 21-2 at 8 (citing *City of New York v. Heckler*, 742 F.2d 729, 737 (2d Cir. 1984)). Yet *Heckler* dealt with complaints of procedural infirmities in the administrative process that were ill-suited for review within that process. As such, its invocation seems inapposite here because, as further discussed below, plaintiff is largely relying upon a different agency decision which purportedly reached differing conclusions on the same questions presented. Certainly, the Appeals Council could have considered these disparate decisions and taken steps to remedy the apparent conflict in interpreting the agency's regulations. Thus, the futility argument proves unconvincing.

4

In its final brief on the matter, the Government seems to admit the possibility that "Plaintiff's non-compliance with § 405(g) is waivable," but argues that plaintiff has failed to provide[] any basis for the Court to do so." DE 21-4 at 5. But there may be one; in its answer filed in March 2024, the Government raised an affirmative defense that included the assertion that "[u]nder 42 U.S.C. § 405(g), [] only the Secretary's final decision, *in this case the ALJ Decision* [ ] is subject to judicial review." DE 11 at 15 (emphasis added). This characterization by the Government in its answer flies in the face of existing law. *Pollard v. Halter*, 377 F.3d 183, 191 (2d Cir. 2004) ("[W]e find that a 'final decision' by the SSA is rendered when the Appeals Council either considers the application on the merits or declines a claimant's request for review, and not simply when the ALJ issues its decision."). Yet the Government's erroneous assertion clouds the jurisdictional issue and raises equitable considerations: having asserted in its answer that the ALJ decision was a final decision subject to judicial review, it seems untoward that the Government now claims otherwise. Moreover, plaintiff might have requested, and the Court could have considered, refiling or repleading *nunc pro tunc* after the issuance of the Appeals Council notice, an approach that may have been scuttled by misinformation in the defendant's answer.

Thus, while there may be a jurisdictional question, the Government's filings throw this issue into some doubt. As such, the Court will proceed to the merits of the appeal.

*The ALJ's Decision is Supported by Substantial Evidence*

As plaintiff acknowledges, while this Court has the authority to review the ALJ's legal conclusions *de novo*, his factual findings are conclusive if supported by substantial evidence. *Zacharopoulos v. Saul*, 516 F. Supp. 3d 218, 220 (E.D.N.Y. 2021) (discussing substantial evidence standard). Here, plaintiff's challenge is focused primarily, if not exclusively, on factual issues. *See, e.g.*, DE 20-1 at 12 (arguing that the "ALJ's decision effectively ignores relevant

5

evidence and testimony from the administrative record"). As this Court has previously held, under the substantial evidence standard, the ALJ's findings:

> as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and therefore, the relevant question is not whether substantial evidence supports plaintiff's position, but whether "substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original); *see also Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a de novo review"). This is a "highly deferential standard of review." *Negron v. Berryhill*, 733 F. App'x 1, 2 (2d Cir. 2018).

*Zacharopoulos v. Saul*, 516 F. Supp. 3d at 220.

In its effort to overcome this substantial hurdle, Plaintiff relies on another ALJ decision issued in a separate case involving a different corporate entity under common ownership with ALH, which plaintiff claims is at odds with the instant decision. *See* DE 20-2 at 21 (the "Garden City decision"). Indeed, plaintiff so heavily relies upon the Garden City decision that it appended a copy of that decision to its papers while failing to provide the Court with a reasonably accessible copy of the ALJ decision plaintiff is challenging. *See* Electronic Order dated April 7, 2025.[1]

---

[1] Indeed, the provision of the administrative record to the Court can only be politely described as a cluster foul-up. The Court freely extended deadlines to allow counsel to complete the process of filing the administrative record. *See, e.g.*, Electronic Order dated January 6, 2025. The parties proceeded to file a partial administrative record, which consists of approximately 12,000 pages separated into 20 indistinguishable files. *See* DE 16, 17 & 19. Only when the Court ordered the parties to do so did counsel provide a Rosetta Stone-like key affording access to the determination subject to appeal, which had not been scanned in a word-searchable format, thereby further evading detection. *See* Electronic Order dated April 4, 2025; DE 22. The Court's efforts to further clarify matters by requiring the filing of a simplified appendix with identifiable ECF citations were waylaid when the parties filed a 750-page appendix with overprinted headers effectively obliterating the ECF page numbers. *See* Electronic Order dated April 4, 2025; DE 22, 23 & 24.

Plaintiff argues that "[t]he incongruent results between this case and the Garden City [*sic*] show that ALJ Chinn did not rely on substantial evidence when rendering his opinion." DE 20-1 at 17. Notwithstanding its bare arguments concerning this purported inconsistent determination, plaintiff supplies no authority suggesting that the Garden City decision has a binding effect on the ALJ below or upon this Court. On the contrary, administrative authorities and practices suggest the opposite. On its face, the document transmitting the Garden City decision states that "[t]he decision is not precedential." DE 20-2 at 4. As ALJ Chinn observed regarding a contemporaneous hearing relating to another business owned by Dr. Rush, "whatever happens to that case doesn't control what's going on here." DE 24, Appx 638.[2] "Such unreviewed prior ALJ decisions are not binding precedent on either an ALJ or the Board." *See Frederick Brodeur, M.D.*, DAB No. 2857, at 12 (2018) ("The ALJ was not bound by the decisions of other ALJs which were not appealed to the Board."); *Alexander C. Gatzimos, MD, JD, LLC*, DAB No. 2730, at 15 (2016) ("ALJ Decisions have no precedential weight and are not binding on the Board."). Instead, such decisions "are useful only to the extent their reasoning is on point and persuasive." *John M. Shimko, D.P.M.*, DAB No. 2689, at 4 (2016). *See also Sandeep Gupta, M.D., et al.*, DAB No. 3088 (2023).

Thus, the Garden City decision does not bind this Court, and review of that 116-page opinion reveals that it is unpersuasive, internally contradictory, ungrammatical and, at times, incomprehensible. *See, e.g.*, DE 20-2 at 34 (asserting that hyaluronan injections conducted "blindly" without fluoroscopy, have an error rate of "up to 34%" then citing other testimony supporting an error rate of "9-29%") and *id.* ("Osteoarthritis is a disease that advances and often,

---

[2] Whether this contemporaneous hearing referred to in the March 2, 2023 transcript was the hearing underlying the Garden City decision remains unclear. *See* DE 20-2 at 22 (stating that the hearing in the Garden City matter was held on March 22, 2023).

7

medications and other treatments are no longer working."). Furthermore, when reviewing administrative determinations, this Court has no means to verify whether the evidence in the two matters is truly coextensive. *Arruejo v. Thompson*, No. 00-CV-2402 (JG)(SMG), 2001 WL 1563699, at *13 (E.D.N.Y. July 3, 2001) ("[T]here is no way for this Court to know whether the evidence supporting ALJ Nisnewitz's decision, such as the testimony of Drs. Sommer and Basuk, was presented before ALJ Kirchgaessner or the other ALJs who rendered similar decisions.").

Indeed, *Arruejo v. Thompson*, a decision written by the well-respected former Chief Magistrate Judge Steven M. Gold, bears important similarities to this case. In that matter, anesthesiologists challenged overpayment determinations by Medicare arising from anesthesiology service provided during endoscopies. *Id.* at *11 ("While anesthesiologists may be able to achieve a greater level of sedation through the use of newer, stronger drugs, the evidence before the ALJ indicated that most gastroenterologists find the more traditional drugs adequate and effective."). According to the plaintiff's evidence in that case, an anesthesiologist could administer "more sophisticated and stronger medications than gastroenterologists," and, with the anesthesiologist present, "the gastroenterologist is better able to focus his or her attention on performing the endoscopy." *Id.* at *10.

Notwithstanding such testimony, an ALJ found, and the court affirmed, that the systematic use of anesthesiologists during endoscopies was not compensable under Medicare, which covered only a service that is "suitable for, but not in excess of, the beneficiary's needs and conditions." *Id.* at *12. Like plaintiff here, the plaintiffs in *Arruejo* "failed, and, in fact, refused, to submit to the ALJ any evidence whatsoever showing their patients had special circumstances requiring the presence of an anesthesiologist." *Id.* at *11. Therefore, Judge Gold affirmed the ALJ's finding that "[a]lthough the more medically complicated drugs may be

8

preferred in administering anesthesia, the evidence shows that these drugs are not medically necessary in every case." *Id.* at *12 (noting that "[t]he use of the word 'preferable' cannot be construed as meaning that use of the newer drugs results in more effective treatment. Rather, the ALJ's statement suggests only that the presence of an anesthesiologist, and administration of the newer drugs, may be medically necessary because a higher level of sedation or a need for close monitoring is necessary *in certain instances*.").

As in *Arruejo*, plaintiff here submits testimony suggesting that the use of fluoroscopy with contrast along with the subject injections might provide – in the opinion of plaintiff and its expert witness—"optimal" rather than "suboptimal" results—a concept highly reminiscent of the "preferable" treatment advocated and rejected for coverage in that case. Plaintiff's witnesses conceded that fluoroscopy and/or contrast is not required in all cases,[3] and plaintiff failed to provide the ALJ with sufficient credible evidence to distinguish those patients who required such

---

[3] The Court notes that in many of the claims, plaintiff included the following language:

> To ensure that the medical device is placed properly into the joint space fluoroscopic guidance will be necessary This will allow for examination to assess the condition of the knee and help to rule out possible contraindications or other pathology causing or contributing to the patient's pain. In order to ensure the device is properly placed specifically into the shoulder [*sic*] capsule itself, subsequent *double confirmation of the device will be necessary as per FDA guidelines*.

*See, e.g.*, DE 16-4 at 155 (emphasis added). While the ALJ did not reference it in his decision, this invocation of FDA guidelines, which has not been repeated during this litigation, might raise further credibility issues concerning plaintiff's claims with the agency.

9

additional services.  As such, the ALJ's opinion here is plainly supported by substantial evidence, and this Court must affirm that decision.

**SO ORDERED.**

Dated:  Central Islip, New York
April 9, 2025

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge
